THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. CECILIO CORTÉS DEL CASTILLO, Defendant and Appellant.

No. 16075.   Argued November 14, 1956.—Decided March 6, 1957.

*Manuel A. García Méndez* and *F. Ponsa Feliú* for appellant. *José Trías Monge, Attorney General,* and *Arturo Estrella, Fiscal of the Supreme Court,* for appellee.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Cecilio Cortés del Castillo was charged in the Superior Court, Aguadilla Part, with the crime of murder in the first degree, consisting in that the said defendant "on or about May 19, 1954, in Isabela, Puerto Rico, . . . illegally, wilfully, with malice aforethought and deliberation, and with a firm and determined intent and purpose to kill, showing that he had a perverted and malignant heart, assaulted and attacked with a revolver, which is a deadly weapon, his daughter, Gladys Estela Cortés Vélez, a human being, inflicting a grave bullet wound which caused the death of the said Gladys Estela Cortés Vélez on the said day of May 19, 1954."

He was also charged with a violation of § 6 of the Weapons Law of Puerto Rico. A jury found the defendant guilty of the crime of murder in the second degree, and the presiding judge, after dismissing a motion for new trial, sentenced him to serve from fifteen (15) to thirty (30) years' imprisonment in the penitentiary. The defendant was also convicted by the court without a jury of violation of the Weapons Law, and sentenced to serve from two (2) to five (5) years' imprisonment in the penitentiary, to be served concurrently with the sentence in the murder case.

The defendant appealed from both judgments as well as from the order denying a new trial, assigning in his brief ten errors. For greater clarity in the discussion of these

errors, it is well to commence with a brief summary of the evidence.

The evidence for the prosecution tended to prove that about 6:30 p. m. of May 19, 1954, while Erasmo Gutiérrez Gutiérrez, a young fellow, was seated on a concrete wall near the place known as Parada Siete del Cartero in the ward of Guayabo, Isabela, talking with Celestino Valentín de la Cruz about a certain deal with a guitar, Erasmo saw Gladys Cortés coming from the store of her father, Cecilio Cortés del Castillo, "frightened, trembling, and nervous," holding her skirt with her left hand. After talking with Erasmo, Gladys walked towards the small house where the events which we will recite later in this opinion took place. Erasmo then went to his home to get the guitar, and on his way back, Gladys, who was standing at the main door of the house holding her skirt with her left hand and holding on to the door with the other hand, called him. Erasmo stopped by the side of the road and she told him not to fail to bring her the photographs; to ask Juan Ramón Saavedra (her sweetheart) to send them to her. Erasmo asked her what she meant by that, what was wrong with her, to which she answered: "The old man does not want me to fall in love; perhaps he wants his daughters so he can abuse them." Just then a shot was heard, Gladys turned around and fell, injured, on the concrete sidewalk in front of the house. When she fell, she said: "Tato, Tino, Tato, Tino, help me, I've been killed, he killed me." ("Tato" was the nickname for Erasmo and "Tino" for Celestino Valentín Cruz.) Erasmo ran toward the house and saw the defendant, Cecilio Cortés del Castillo, coming from the rear of the house running toward his store and carrying in his hand a black revolver, similar to the one which was admitted in evidence. This revolver belonged to a son of the defendant and for some time the son kept it in the store in his father's desk. This was the revolver which discharged the bullet that entered the body of Gladys near the posterior axillary line,

producing a massive intra-abdominal hemorrhage which caused her death shortly afterwards. When Erasmo reached the gate of his house, defendant Cecilio Cortés del Castillo called him, but Erasmo answered, "I will come later." Erasmo entered his house, drank some water and after speaking with his sisters, he returned to the place where the defendant was. The defendant asked him if he was there when "this thing happened to my daughter," and, upon answering in the affirmative, the defendant said to him: "If you are called to testify tomorrow, say that she shot herself." Witness Luis Moreno Medina testified that he saw Gladys in the house talking with Erasmo; that on his way back from the house of defendant's wife, together with defendant's son, he heard a shot in the direction of the house and saw defendant Cecilio Cortés running out from the rear of the small house toward the concrete house, and also saw Gladys lying on the sidewalk in front of the small house. He did not see who fired the shot. Another witness, Benigno González Moya, testified that that afternoon, before the occurrence, he saw the defendant walking toward the small house where Gladys was, and that he had entered by the rear. There was also evidence that the deadly weapon was discharged at a distance of not less than six inches from the body of the deceased. There was also evidence for the prosecution tending to show that after the occurrence, that same night, the defendant searched the house together with two American fellows who lived in the upper story of the store, but did not find any weapons; but that later, that same night, the Prosecuting Attorney and detective Rosario Maurás searched the house and the latter found a Colt revolver in the middle of the living room, which was the weapon from which the bullet which caused Gladys's death was discharged. There was also evidence on other particulars which we will not summarize, for the sake of brevity and because it is unnecessary for the discussion of the errors which we shall consider hereinafter.

The evidence for the prosecution in this case, as may be seen, is circumstantial, since none of the witnesses for The People saw the defendant discharging a firearm at his daughter Gladys.

The theory for the defense was that Gladys herself inflicted the bullet wound, that is, that she had committed suicide, and also that the defendant was not at the scene of the occurrence, so that he had no intervention in or responsibility for the death of his daughter.

The witness for the defense, Ángel M. Pesquera, chemical and ballistics expert, testified that in his opinion the hole on the blouse which Gladys was wearing when she was wounded shows that it was a contact shot, i. e., fired directly at the body.

The third error assigned by appellant in his brief is as follows:

"The trial court committed a serious error, which is prejudicial to defendant's right, in refusing to order the District Attorney to deliver to the defense, for purposes of impeachment, the statement made by witness Erasmo Gutiérrez Gutiérrez in the investigation of the case."

On cross-examination, witness Erasmo Gutiérrez testified that on May 20, 1954, that is, the day after the occurrence, detective Maurás came for him and took him in a jeep to the Isabela Police Headquarters. From there the witness, Maurás, and District Attorney Archilla went to the scene of the occurrence, the house, and then returned to the Police Headquarters at Isabela, where Erasmo immediately started to testify in the presence of District Attorney Archilla, the Justice of the Peace of Isabela, and another person who typed on the machine what Erasmo was testifying. After giving his statement, Erasmo signed it.

Thereafter, in the same cross-examination, the witness testified, although he had denied it persistently, that about two weeks after giving his statement in the Isabela Head-

quarters he was taken to the Superior Court of Aguadilla, where he gave another written statement to District Attorney Archilla, containing the same facts as his first statement. The defense proceeded with the cross-examination, and the following took place:

"Q.—Tato, is it true or not . . . please tell me if what I am going to ask you is true or not: that in the statement which you gave to District Attorney Archilla on May 20, 1954, which was the day after the occurrence, you told the District Attorney that Gladys had shot herself?

"A.—Well, the first time I did say that; at first I told him that.

"Q.—One other question, Tato: Is it true or not that in that same statement, which was the one you gave to the District Attorney on May 20, 1954, you told him that you had not seen Cecilio?

"A.—No, sir; but they won't let me talk either; I would like to tell what I know also.

"Q.—Answer my question.

"A.—No, sir, it is not true, but I would like to be permitted to talk.

"Q.—Is it true or not, Tato, that in that statement which you gave to the District Attorney you said that Gladys was standing at the door in the manner that you described it yesterday to these twelve gentlemen, that is, with her left hand holding something here and with the right hand leaning against the doorcase?

"A.—Yes, sir, I did say that.

"Q.—In the first or in the second statement?

"A.—In the first.

"Q.—Is it true or not, Tato, that in the statement which you gave to the District Attorney on May 20, 1954, you did not say that Cecilio had spoken to you and that he had told you to say that Gladys had shot herself?

"A.—Yes, sir, I told him in the statement.

"Q.—And is it true or not that in your statement of May 20 you never told the District Attorney that you saw Cecilio carrying the weapon?

"A.—Yes, sir, I told him.

"Defense.—We are going to request Your Honor to order the District Attorney to produce the statement given by this witness, to which we have made reference, and also the testimony given a few days later, two weeks later, for the purpose of impeaching the witness.

"Hon. Judge.—Request denied.

"Defense.—We take exception. We are through with the witness." (Tr. Ev. 464–66.)

Later, on examination by the District Attorney, he testified:

"Q.—Please tell these gentlemen of the jury why you told the District Attorney offhand that she had shot herself. Say it here to the gentlemen of the jury.

"A.—I first told the District Attorney what I did because Cecilio Cortés had threatened me that I had to say that she had shot herself, but when I realized that that was not true, since I am a religious person and knew that some day I had to die, that's why I told the truth.

"District Attorney.—That's all with the witness." (Tr. Ev. 466–67.)

In a criminal prosecution, the credibility of a witness may be impeached by the party against whom he has been called to testify, among other means, by evidence that he has made at other times statements inconsistent with present testimony; but before this can be done, the statements must be related to him, with the circumstances of time, places, and persons present, and he must be asked whether he made such statements, and if so, allow him to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them. Section 521 of the Code of Civil Procedure (Law of Evidence), 32 L.P.R.A. § 2151; § 245 of the Code of Criminal Procedure, 34 L.P.R.A. § 724. In using this means to impeach the credibility of a witness, it is indispensable that the foundations be laid by the examination of the witness as to his alleged inconsistent statements. *People* v. *Ayala*, 51 P.R.R. 542; *People* v. *Santiago*, 16 P.R.R. 446; *People*

v. *Díaz*, 5 P.R.R. 197. If the prior statement was made in writing, such statement must be shown to the witness before questioning him in regard to it. *People* v. *Barrio*, 57 P.R.R. 924; *People* v. *Lebrón*, 61 P.R.R. 634; *People* v. *Torres*, 75 P.R.R. 219.

In the present case, the trial judge deprived the defendant and appellant of his right to impeach the credibility of the star witness for the prosecution by refusing to order the District Attorney to deliver to the defense the written statements made by Erasmo Gutiérrez in the preliminary investigation. This witness admitted in his oral testimony that at first he had stated to the District Attorney that Gladys had shot herself. Later he explained why he made those statements offhand to the District Attorney. The witness also denied having made other prior statements inconsistent with his statement in court. It was then that the defense requested the court to order the District Attorney to produce the two earlier written statements made by the witness in the preliminary investigation. The request was denied and the defense took exception.

In maintaining that the lower court did not err in so acting, the appellee argues that in this case, as in the case of *People* v. *Garcés*, 78 P.R.R. 95, there is no need to determine whether a district attorney may be compelled to deliver to the defense a written statement which is in his possession, given to him by a witness in the preliminary investigation of the cause, since the defendant herein did not lay adequate foundations for the request which he made. Its contention is that in this case it was not proved that the alleged inconsistent allegations appeared in the statements made in writing by witness Erasmo Gutiérrez before the District Attorney, but that such allegations were made orally to the District Attorney before the witness made the first of the said written statements.

As already noted, the question put by the defense as to the inconsistent statements which the witness admitted having made was specific. Again we copy the question:

"Q.—Tato, is it true or not . . . please tell me if what I am going to ask you is true or not: that in the statement which you gave to District Attorney Archilla on May 20, 1954, which was the day after the occurrence, you told the District Attorney that Gladys had shot herself?

"A.—Well, the first time I did say that; at first I told him that."

We have read carefully the transcript of the stenographic notes of the trial and find nothing therein to show that witness Erasmo Gutiérrez made any oral statement to District Attorney Archilla before making his first written statement. In the absence of any showing in the record that this is what happened, we must not take as true, on the basis of mere speculations, that the inconsistent statements made by the witness to the effect that Gladys had shot herself did not appear in the documents requested by the defense in order to impeach his credibility.

On the other hand, the fact that witness Erasmo Gutiérrez admitted having made the prior statements inconsistent with his oral statement, was no ground for denying the request made by the defense. Already in the case of *People* v. *Lebrón*, 61 P.R.R. 634, we stated that the written statement, once it is admitted in evidence, must be read to the jury as the best evidence of what the statement contains. As stated in *Gordon* v. *United States*, 344 U. S. 414, 97 L. Ed. 447, "We think that an admission that a contradiction is contained in a writing should not bar admission of the document itself in evidence, providing it meets all other requirements of admissibility and no valid claim of privilege is raised against it. The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's descrip-

tion and this is no less true as to the extent and circumstances of a contradiction." See, also, *United States* v. *Krulewitch*, 145 F. 2d 76; "Admission by the witness of having made a prior contradictory statement is not a substitute for inspection," 45 Colum. L. Rev. 462.

The defense also laid down the foundations for impeaching the witness on other important particulars of his statement. On this occasion, when answering a series of questions on cross-examination, the witness denied having made in writing the inconsistent statements alleged by the defense.

██ Generally, in a criminal prosecution in this jurisdiction the sworn statements given in the investigation conducted by the prosecution are beyond the reach of the defendant. This is so because the preliminary investigation made by the District Attorney is of a private character. *People* v. *Álvarez*, 70 P.R.R. 791; *Castro* v. *González*, 58 P.R.R. 369; *Sostre* v. *Calzada*, 33 P.R.R. 237; *People* v. *Beltrán*, 18 P.R.R. 908. However, in reiterating this rule, we said in *López* v. *Superior Court, ante*, pp. 470, 473, the following:

"We have stated time and again that the preliminary investigation made by the prosecuting attorney is of a private character, and he cannot be compelled to show it *unless* he has waived this privilege or *the defendant needs the statements made at the preliminary investigation for the purpose of impeaching the witnesses' credibility at the trial.*" (Italics ours.)

Hence, the private character of the initial proceedings of the prosecution is no definite bar for the defendant to use it for purposes of impeachment. Otherwise, his right to impeach the witnesses for the prosecution with evidence of inconsistent statements, consecrated by the Law of Evidence and the Code of Criminal Procedure, would be academic in a majority of the cases.

In view of the foregoing, we must conclude that the fourth error was committed and, since it prejudices the rights of the defendant, the judgment appealed from will

be reversed and a new trial ordered. See *People* v. *Álvarez,* 70 P.R.R. 791, and *Maldonado* v. *Rebollar,* 75 P.R.R. 819.

■■ The fifth error is that the lower court committed "a serious error in not charging the jury on voluntary man-slaughter as a verdict."

The error was not committed. There is nothing in the evidence to show that Gladys' death was caused by reason of a sudden quarrel or heat of passion. Section 203, Penal Code (33 L.P.R.A. § 635). On the contrary, the evidence believed by the jury clearly established the crime of murder. Consequently, the court was not bound to charge the jury on manslaughter, *People* v. *Ortiz,* 68 P.R.R. 632; *People* v. *Berdecía,* 59 P.R.R. 317; *People* v. *Calderón,* 50 P.R.R. 323; *People* v. *Negrón,* 37 P.R.R. 765; *People* v. *Rosado,* 17 P.R.R. 417, and particularly since the defendant denied having killed his daughter Gladys, maintaining, as a theory of defense, that he was away from the scene of the events and that Gladys had committed suicide. *People* v. *Arroyo,* 61 P.R.R. 398. Appellant argues, however, that since the evidence for the prosecution was circumstantial and, even if it were concluded that he was the one who fired, since there is absolutely no evidence to show the circumstances under which the defendant fired the shot, the determination of such circumstances may be made only on the basis of inferences. He further maintains that whether the acts of the defendant were deliberate, or whether they were premeditated but without deliberation, are questions of pure inferences and, consequently, the possibility that the defendant acted in a heat of passion should not be excluded.

We disagree. In the absence of evidence that appellant fired the shot on a heat of passion, the presumption is that he acted with malice. *People* v. *Torres,* 75 P.R.R. 219; *People* v. *Méndez,* 74 P.R.R. 853.[1] And, as we know, the

---

[1] In the *Méndez* case we said:

"As we have seen, the jury was informed that when the death of a person is evident and there is no circumstance in the evidence tending

crime of manslaughter consists of the unlawful killing of a human being without malice. The crime of manslaughter as a possible verdict was clearly contrary to law in this case, since it does not appear from the evidence that there was marked provocation on the part of the victim. *People* v. *Calderón, supra.*

■ The second error assigned by appellant is as follows:

"The excessive publicity prior to the trial, which was adverse to the defendant, originated and encouraged by the District Attorney and other authorities, deprived the defendant of a fair and impartial trial, and his conviction is therefore in violation of the due process of law."

We find it unnecessary to consider this error. The question enunciated therein was raised by the defense during the selection of the jury on March 1 and 2, 1955, when eight jurors had already taken oath. It will be recalled that the events occurred on May 19, 1954, and that they were published by the press and transmitted over the radio nine months prior to the trial. Many of the jurors who were examined affirmed that they were familiar with the information published. Some said that they recalled what they had read and heard. Others stated that they did not recall, and even others affirmed that they had not read or heard the information. Although some of the jurors stated that they had formed an opinion and that that opinion was definitive and invariable, a majority of them, however, stated that they had not formed an opinion or that their opinion was neither invariable nor definitive.

---

to mitigate, excuse or justify the act executed by the person accused, implied malice is then presumed. The jury was also told that when the circumstances point out to the death of a human being at the hands of another, malice is presumed. This latter instruction must be considered together with the former, that is, that presumption arises when there are no circumstances of mitigation, excuse or justification in the evidence. The instruction given complies with the law and statutory provisions prevailing in this jurisdiction." (74 P.R.R. 865.)

This occurred some nine months after the news was transmitted over the radio and by the press, which the defendant alleges was prejudicial to him. Since the new trial ordered will be held more than two years and a half after the publication of the information which is allegedly prejudicial to the defendant, we are not at this time in a position to anticipate that the defendant will not have a fair and impartial trial in the Aguadilla Part of the Superior Court as a result of such information. Therefore, the decision of the question whether such publicity was prejudicial to the defendant and, consequently, deprived him of a fair and impartial trial, lacks practical finality.

■ The ninth assignment alleges that the lower court committed an error of law in convicting the defendant of a violation of § 6 of the Weapons Law.

We can not agree with appellant that there was no evidence on illegal possession. On the contrary, the evidence presented by the State and admitted by the court is sufficient to support the conviction of the defendant of the crime charged. See *People* v. *Rivera*, 60 P.R.R. 727. However, in view of the error committed by the trial court in connection with the testimony of Erasmo Gutiérrez, key witness for the prosecution in the case for violation of the Weapons Law, the judgment appealed from will be reversed and a new trial ordered.

In view of the result reached by us, it would be futile to consider the remaining errors assigned by appellant.

The judgments appealed from will be reversed and a new trial ordered in each one of the causes.

Mr. Chief Justice Snyder dissented.

Mr. Justice Negrón Fernández did not participate herein.

Mr. Justice Sifre concurs in the result.